I think it's important in evaluating our appeal to look at two things first as kind of a threshold for the remainder of the argument. First is how should this market function? How should it really work if it's going to be effective? If children going to a hospital are going to be effectively serviced by qualitative and quantitatively competitive and competent physicians? And secondly, how does the statutory scheme of the HECWA, as we call it, the Health Care Quality Improvement Act of 1986, integrate with that ideal market? And how does the ideal market here and how does the court's interpretation of HECWA fail both of those tests? And why must the district court be reversed so that the market in San Diego works properly and its integration with HECWA works properly? Now I don't know in your cases. I'm the parent of a young child. Probably many of us here are. If my child needs to go to a hospital, I want that care to be the best it can possibly be. I want the physicians to be of the highest possible quality. I want them to be competing with each other in a collegial effective way, both qualitatively and competently, so that when my child is seen in an emergency room for surgery, evaluated by a radiologist, that is the best possible care. Now Dr. Hilton happens to be, if I may, I apologize, I need to bring this up. This is referred to in the excerpt of record. It's incorporated to Exhibit A of the complaint itself. Dr. Hilton is the co-author of the textbook of pediatric radiology most widely used in virtually every medical school in the English speaking world and most medical schools throughout the world. She is a clinical professor of pediatric radiology at UCSD and has been for several years. Her listing of articles, both vetted and non-vetted, runs for, I believe, more than 40 pages in her VITA, which is Exhibit A to the complaint. There is no objective doubt that Dr. Hilton is not only qualified to practice pediatric radiology. Dr. Hilton Counsel, I really don't get your point. Because you're up here on appeal. Dr. Kahn Let me move on. You're right, Your Honor. I simply want to establish this is not the normal case under HECWA of a disaffected physician, someone who is Dr. Hilton Right. Go ahead, Your Honor. I'm sorry. Dr. Kahn Go ahead. Dr. Kahn How does this integrate with the statutory scheme of HECWA and the issues that are up on appeal? HECWA is intended, on its face, to create sort of the benefit of the doubt, if you will, that if regulatory procedures are followed, if health care actions and activities are properly taken, they are presumed to be okay. Here, what we have is a failure of that system. Dr. Hilton Well, the way I understand it, your client applied to the hospital for privileges that your client did not yet have. Is that right? Dr. Kahn She applied for privileges which she did eventually obtain. Dr. Hilton Well, but she applied for privileges which she did not yet have. Dr. Kahn Correct. Dr. Hilton There's nothing wrong with making her apply, is there?     Dr. Kahn Correct. Dr. Hilton And then she went through the process of applying for those privileges. Dr. Kahn Correct.  And then she went through a process.  Yes. Dr. Hilton And she eventually got the privileges that you were asking for. Dr. Kahn Eventually. Yes. Dr. Hilton Right. But she is suing for something that happened during the process of getting her the privileges. Dr. Kahn She's suing for two things. She sued for damages. She sued for injunctive relief. The key thing that was going on was an explicit market division agreement between the defendants such that no one who was not employed by the San Diego Radiology Group could practice pediatric radiology at Children's Hospital. Children's Hospital has a number of essential and unique facilities such that the only place you can practice pediatric radiology within San Diego, probably Imperial, and South Orange County is Children's Hospital. So you have the gatekeepers, the members, the partners, and employees of the San Diego Radiology Group, a private group for profit of physicians who basically control the keys to admission to practice pediatric radiology at Children's Hospital, a tax-exempt nonprofit institution. Dr. Hilton applied for privileges. It took several months, and I'm sure this panel has reviewed the series of letters and such, before she could get even a definition as to what they wanted, and the definition was always changing. Well, she wasn't necessarily always immediately forthcoming with information she was asked for either. Well, Your Honor, she was, I think, exceedingly forthcoming, but the target was always moving. She was asked for her clinical experience. She provided that. She went to a five-week continuing education program at the university in Cincinnati, and after Children's learned of that, then they asked for that information. Meanwhile, and it is not in front of you because we didn't learn of it until as we were coming up here, employees or prospective employees of the San Diego Radiology Group were getting privileges within two to three weeks, and these were people who were not board-certified  They were just radiologists. Is that what we're talking about? No, it's not. So how can we consider that here? You can't consider that directly, Your Honor, but I think you can consider it within the scope, especially on a 12B6 record, of the information consistent with the complaint that we could have come forward with had we been given the opportunity, for example, on a summary judgment motion as opposed to a motion to dismiss simply on the initial pleadings. I think in that way you can consider it. But I think to give you the accurate snapshot, you have this incredibly qualified physician who is hanging out there for more than a year waiting for a yes or a no answer, repeated written demands, give us a time in which you're at least going to make a decision. And she never got a response to those. So we file a lawsuit in May of 2002, having never received a response on the question of will you let me practice or will you not let me practice? What's the target? What's the objective standard I'm supposed to meet here? And then after the lawsuit is filed and served a month later, even though Dr. Hilton didn't give them the additional information, they then said they still needed. She just said, look, time out. I'm tired of the target shifting. You're going to be asking me for information in 2006. Just make a decision. They still didn't do that until the lawsuit was filed and served. And then a month later in June, I believe June 20, the Board of Children's Hospital says, oh, come on. Come on and practice. And then the members of the competitive physician group, San Diego Radiology, make it impossible for her to professionally practice. They won't see her patients. They won't integrate with her in any way. Now, she's not looking to go out to dinner with them. She's not. Why is this barred by the Health Care Quality Improvement Act? Why is it not? Because the broad conspiracy that we're talking about, which is the market division, a written agreement literally between the regents of the University of California and the San Diego Radiology group that has, in fact, been enforced by the medical chief of staff and the department chair at Children's Hospital, is much broader than a professional review action or a professional review activity. Now, HECWA grants conditional immunity only for professional review actions. A professional review action is, as I read the statute and as the cases have, I think, fairly interpreted the statute, a decision that is made to terminate, suspend, or limit existing privileges. Well, don't we have a professional peer review situation here that comes under the compass of this? You certainly have a professional review situation, as you're terming it, Your Honor. The question is, does HECWA operate to give the defendants here immunity from antitrust liability for what they did and what they were doing? So we've got to look with, I think, a focused lens at the statute. The statute gives, first of all, immunity only for damages claims, okay, not injunctive claims at all. It gives immunity for damage claims for claims arising from professional review actions, okay? We don't have an action here. The action didn't trigger any of the liability because not taking an action isn't an action under the statute. Was she denied privilege as a result of some antitrust agreement? Yes, Your Honor. When the University of California elected with children's inducement to shut down its pediatric wing at University Hospital, part of that agreement, as we learned from Dr. Edwards, who actually talked to these people at the university, they gave him copies of these documents, was literally an agreement that none of the faculty members who were teaching pediatric radiology at the University of California would seek privileges or could seek privileges at children's hospital. And that's your claim? That's our claim. And when she sought privileges, was she told, you don't qualify because we have this market division agreement? She was told she couldn't apply for privileges by Dr. Radke of the University of California. Because of the market division agreement. She decided, to heck with you folks, I'm applying anyway. And then she was given the runaround month after month after month after month after month with no objectively reachable target, no ascertainable objective standard. Was she ultimately denied privileges because of the market division agreement? She was ultimately granted privileges because of the lawsuit. So she was allowed to go through the process? She was granted privileges. Now, was she granted the right to actually effectively practice pediatric radiology at children's? No. She was given privileges. She sought effective admission. She was literally on premises for a period of weeks as they were attempting to negotiate, you know, how is this really going to work? I thought she had these privileges, these two privileges from another hospital also during the same period of time. She has privileges at Kaiser and I believe one other facility in the San Diego area. The problem is for pediatric radiology patients, Children's has quite literally a unique facility. It's as if they have the only bridge across the Missouri River. There is specialized equipment. There are specialized and trained clinicians that work with that equipment. We cited in the initial complaint Children's Hospital's own marketing materials off their website where they emphasize that. Where if you've got a kid who has something more than a broken bone, more than an earache, more than kind of the routine childhood illnesses, if they need specialized critical medical care, Children's Hospital within San Diego literally defines that relevant market because of the assets it has. And that's great. That's a wonderful institution to have. But then instead of independently operating as a hospital, objectively reviewing the credentials of people seeking admission, you've got a proprietary organization uniquely running, not all the departments, but the radiology department. And at the same time, Dr. Hilton is twisting slowly in the wind, their own people, much less qualified, are getting in immediately because they're going to be a profit center for SDDR. Dr. Hilton is a source of qualitative and quantitative competition. So under the statute, getting back to I think the issue that we all need to appropriately address, there is limited conditional immunity for a professional review action, a conspiracy to never take an action, to never make a decision, to let it sit forever if that's what it took, isn't a professional review action under the statute. It is, in fact, an active contract combination and conspiracy under Section one of the Sherman Act. And certainly by SDDR, it's so far a very effective monopolization under Section two. HECWA doesn't provide immunity for that. It provides immunity for a peer review action, which in every reported case involving the immunity for an action, that is a decision to terminate or suspend existing medical privileges. Were you ever given an opportunity to establish as a matter of fact that what was happening here was a professional review action? An antitrust violation blocking your clients from participating on one hand or a peer review on the other? I mean, is there a finding of fact, a judge, a jury says, we find as a matter of fact that this was peer review. We find as a matter of fact that this really was the result of an unlawful... We are up on a 12B6 record, so the trial court made no findings to the fact of any kind. And in fact, the trial court never gave us 30 seconds of oral argument. Not even a summary judgment on that issue? Never came up. And you're arguing, I guess, at the very least, there's a genuine issue of material fact as to what it was that was going on. Absolutely. Was it peer review or wasn't it peer review? Absolutely. I guess you would concede if it was peer review, you lose. No, no. I think, and with great respect, the term peer review is never used in the HECWA statute. The terms are professional review action, professional review activity. They are tightly defined. Well, I know that you distinguish between that she's seeking new privileges as opposed to reviewing the work and whether they should be suspended or whatever. Correct. But my understanding is the whole purpose is so that people will come forward and say if someone's doing a bad job, so that those of us that don't know any better, when we go in there, you know, we don't have to be subjected to bad doctors. Absolutely. And that would seem to me very clearly whether you're granting privileges, whether you're suspending or whether you're, you know, revoking or limiting or doing whatever, it would be the exact same thing. You want doctors to come up against other doctors and say this isn't a very good doctor and, you know, we're going to protect the public from this individual, whether it be granting them privileges or taking them away or whatever. Which brings me to the discrete issue of how the HECWA statute integrates with the antitrust laws, how it should function, and it's very important, I think, that you look at HECWA for what it is, not what you might broadly think it is based on the misreadings of the district court. HECWA doesn't grant blanket immunity for anything anybody does in terms of qualitative peer review. That ain't what the statute says. It certainly isn't what it does. It isn't what Congress intended for it to do. It is very narrowly limited. First, there's no immunity whatsoever for injunctive relief. Okay. We sought injunctive relief here, but the trial court tended to just flush that away by saying it became moot because we kind of got what we wanted after we filed the lawsuit. Therefore, we shouldn't have filed the lawsuit. That circular reason defies my processing, and I hope it is defied by yours. Secondly, the statute provides only conditional immunity for a peer review action if that action meets all the standards specified in Section 11112A, which most specifically says that they got to show that what they were doing was in fact to generate quality medical care, not to enforce an antitrust conspiracy. If Children's Hospital can say the reason we kept the author of this book hanging around for nearly a year, waiting for a decision, gave her a constantly moving target, never reached a decision until she filed a lawsuit seeking injunctive relief, and once she got in here, we made it impossible for her to practice because if she saw an incoming patient, we told her that we wouldn't provide any services to that same patient, even if they came back a week later after an accident. And Dr. Hilton says, wait a minute, my concern isn't making money or generating a bunch of billing. I care about my patient. And if I've got a patient here, and then I'm going to be out of service for a 12-hour period in a week, and she needs some additional emergency radiology work, and these guys are saying, we're not going to see that patient, we are going to refuse to provide her medical care if your fingerprints are on that patient file. I, Dr. Hilton, can't work in an environment like that because it's not safe for patients. I'm going to retreat for a while until I can get an injunction that says, wait a minute, you can't do that. The focus has to be on proper health care for the patients. But getting back to the HECWA, the defendants never attempted to show that any of these actions were in the interests of quality medical care as required under Section 112A. The district court found, based, I think, incorrectly. It's your theory they just didn't want her to work there, so that not getting to her, so it wasn't really about that they were even reviewing her. They were just being obstreperous, right?  More than obstreperous. And HECWA shouldn't shield them from that. Just as Henry Waxman said, one of the authors of the HECWA bill, HECWA is not intended to be a shield protecting antitrust activity. That's what it's been used for here so far successfully. That's not what the statute says. That's not what it's about. Section 111514B of HECWA also integrates or illustrates this concern for antitrust liability. If the party at issue, the reviewing party, has been found to have engaged in improper activities, anti-competitive activities by the FTC or any court, then for five years, HECWA just offers them no protection whatsoever. So clearly Congress was looking at, okay, we've got a peer review process that we want to work. We absolutely do want qualified physicians reviewing other physicians, get rid of the bad ones, keep the bad ones out, keep looking at them on an ongoing basis, make sure that quality health care is being delivered. No problem with that objective whatsoever. That's great. But the statute does not create and does not yield absolute immunity for abuse of the process to keep out your competitor. And here... Your time has expired. We'll hear from the other side and we'll give you a chance to respond. Appreciate that very much. Thank you. Good morning, Your Honors. May it please the Court. My name is Jose Manuel de Castro. I'm from Foley and Lardner. Representing Children's Hospital with me here today is my co-counsel, Jim Gattas, as well as counsel for San Diego Diagnostic Radiology Medical Group. As these appeals have been consolidated, counsel for SDDR and myself will be splitting the time ten minutes each. I thought that the district court had pontificated on the application of HECLA with respect to SDDR, at least, that indeed a person was indeed a person entitled to immunity under the Act. Did the district court so hold? I'm sorry, that a person was a person entitled to immunity under the Act? Yes. I believe Your Honor is quoting from... The defendants here.  There can be no dispute, and I don't believe there's been a dispute from appellants with regard to whether the defendant entities are proper subject matters of potential immunity. They are peer-reviewed bodies or peer-reviewed participants in the case of SDDR. So there can be no dispute as to their potential immunity. Nor, quite frankly, could there be any dispute as to their actual entitlement to immunity in this case. The one thing, as I sat here this morning, the one thing that I heard Mr. London say this morning that I completely agreed with is that this is not a normal case under HECLA. That's a question that I have in terms of the 12B motion as opposed to the summary judgment. And basically, you know, the plaintiff's thrown out, and they're saying this really isn't a peer-review case. This is about people keeping a doctor from working, not because she's not qualified. It has nothing to do with any of those things because they have this marketing agreement, and she and what was going on here was not peer-review. It was obstreperous behavior trying to look like peer-review, and when really, in fact, nothing was going on. I mean, we don't have that record before us because it's a 12B. You know, it's just gone. And so we don't know whether that's true or not, but they're saying that's what they could show. Well, Your Honor, I have a few different responses to that. You're absolutely correct. This is a 12B6 motion, not a motion for summary judgment. The fact that the court did have a large amount of factual material before it does not necessarily alter that determination, but I would note for the record that the court had before it a lengthy and detailed speaking complaint with 20-some odd exhibits attached, additional exhibits attached to the motion to dismiss that were referenced in the complaint but not attached. So this was a factually intense 12B6 motion. But I think more importantly, this is not a motion where we – this is not a situation where we need summary judgment. Dr. Hilton received every privilege for which she applied. She received them in due course, and there can be no dispute, and there has been no dispute about this fact. In due course, there's a huge dispute over in due course. The whole case is that this really wasn't peer review at all. This was simply an agreement being enforced by a bunch of people that they argue violated the antitrust laws and all the other laws. Your Honor, but the point being that because there was no adverse action, there is no adverse peer review action. Well, her claim is there was no action until she filed a lawsuit. Well, I can certainly address the factual record because the factual record was distorted by Mr. London, and I can certainly clarify that. But the important point, the important legal point is that what's being challenged here, at least with respect to Children's Hospital, is exclusively what is defined under HCWA as peer review activity. Peer review activities are subject to absolute immunity. There can be no set of facts. If somebody applies and the person's responsible for granting the privileges or not say, we're keeping her out because we don't like where she lives, and they have a hospital down there, so she's just out here. Is that peer review activity entitled to immunity under HCWA? Your Honor, it is. In this case, it's peer review activity because Dr. London has alleged it's peer review activity. What is going on here. But is that peer review activity if the people in the hospital say, well, we have a market division agreement, and she's out because she doesn't qualify under that market division agreement, does HCWA give immunity for that kind of a decision as compared to she's not qualified to use these facilities for these purposes? Well, HCWA certainly would not immunize that conduct. Is that what he's saying this is all about? The market division agreement is what blocked her for all that period of time. It had nothing to do with peer review. That was a smoke screen. Well, Your Honor, as long as the two points, first of all, as long as the peer review that was going on here, and there certainly was peer review, there was an application for privileges, and there was a disposition of that application for privileges. What shows there was peer review as opposed to caving in because the people realized the market division agreement was going to get them in trouble? I mean, was there peer review or caving in? Your Honor, there was peer review. And the facts demonstrate there was actual peer review rather than form over substance. There are a number of things that demonstrate that. One, Dr. London has not pointed to a single request made by this hospital that was not relevant to her qualifications. The hospital asked for indisputably important materials, evidence that she had received these privileges from other hospitals, evidence that she was qualified to perform the additional functions, the additional CT and ultrasound functions. They weren't asking for where she lived. They weren't asking for where she went to high school. They were asking for whether she was qualified for performing services. The allegation from the other side is this was just a smoke screen, and it really had to do, it was the dragging feet and all the rest of that kind of stuff. It really had to do with a market division agreement. So the point is it would be nice if we had some kind of a determination in the nature of summary judgment at the very least that it was peer review activity. Right now we have allegations that it wasn't and allegations that it was, and it's kind of hard to resolve that on a 12b-6. You're right, there's a complaint with a lot of other stuff, but it wasn't converted into a summary judgment motion. It was handled as a 12b-6. And so factually we don't know yet whether it was peer review, as he says it wasn't, or peer review as you say it was. I would respectfully submit that we don't have a complaint that alleges all sorts of other nefarious things. All we have is the original complaint that was on FONT. Dr. Hilton never sought leave to amend that complaint. Dr. Hilton submitted an additional document framed as an amended complaint seven weeks after Children's Hospital was dismissed with prejudice. So that complaint has no bearing on this appeal with respect to Children's Hospital. And to this day Dr. Hilton has not pointed to a single act taken by Children's Hospital that does not constitute peer review activity. This market division agreement that Dr. Hilton's counsel talks about is an agreement that- Did it exist? This is an agreement I certainly have no idea whether it exists. Dr. London, I'm sorry, Mr. London has not alleged that Children's Hospital was a party to this agreement. He said in his papers and he said here today this morning, this is an agreement between UCSD and STDR. Children's Hospital knows nothing of any such agreement. Children's Hospital never acted on any such agreement. You don't know anything about this? There was no market division agreement, Your Honor. There was certainly no market division agreement to which Children's Hospital was a party or to which Children's Hospital has any knowledge. What happened here was legitimate peer review. If Dr. London had a problem with how long the process was taking, and I'll note for the record that the process was not taking any longer than the normal processes involved, if she had a problem with the process, her proper recourse was to file a petition for writ of mandate with the court to compel the hospital to act and to act positively or negatively on that application. Now, she had no occasion to do so because her privileges were granted. Her first round of privileges were granted. Meanwhile, all that she asked for, her first round of privileges were granted in a matter of weeks. The expansion of privileges, which are highly skilled areas, took a little bit longer. And they took a little bit longer because those are highly technical specialties and because the group felt it necessary to investigate her qualification. There's nothing in the record about this market agreement? There's nothing in the record about this. Except allegations that there was one. Except there's nothing in this record about a market division agreement involving children. There's no allegations about a market division agreement involving children. There's no allegations. If you want to address those questions to someone that is alleged to be a party to that agreement, you're more than welcome to. But with respect to children, there is no market division agreement. And this is a very simple case with respect to children. What we have here is pure and simple peer review activity. And this Court has recognized on a number of occasions, as have other courts, that peer review activities are absolutely immune. The Fobbs v. Holy Cross tells us that. That is a decision by the Eastern District of California that this Court affirmed. You're right. There's no question about that. But the question raised by the other side is whether this was peer review activity. Well, as there can be no dispute that with respect to children's hospitals, there was nothing but peer review. As Your Honor is well aware, there is no ‑‑ there can be no liability for an agreement or a conspiracy on its face. What we need is conduct in furtherance of. And the only conduct alleged on behalf of children's hospital is pure and simple peer review. Your ten minutes is up. I hate to interrupt you, but ‑‑ Thank you, Your Honor. Thank you for your time. Good morning, Your Honor. My name is Edward Vogel, and I represent the Physician Defendants. What do you know about a market division agreement? I don't know about a market division agreement. As far as we know, there is no market division agreement, Your Honor. And I think the best evidence of that is counsel got up here and said there's a market division agreement. The terms of that market division agreement are that SBDR and UCSD and Children's Hospital conspired to keep Dr. Hilton out of children's hospital. That's what the great grand and glorious agreement is supposed to be. Yet within three months of Dr. Hilton applying for privileges at children's hospital, she is granted every privilege she requests. Every single one. That's what's in the record about a market division agreement. It's clear that if this grand and glorious agreement was she's not going to practice at children's hospital, why would children's hospital, why would SBDR, which is supposedly the gatekeeper, grant her every single privilege she requests? When was the lawsuit filed in connection with granting all the privileges that she was granted? The lawsuit was filed, Your Honor, I believe it was ‑‑ She made a request initially for privileges that were granted. Her request did not call, and I don't recall the exact date, so I'm going to give you a timeline very quickly. And perhaps counsel ‑‑ Diagnostic radiology and fibroscopic whatever it is on 62801. 62801. June of 01, Your Honor. And in her application, which is part of the record. Before or after? After. After. She made two applications for privileges here, and I think that's what's important. And both these applications were made supposedly after this market division agreement. And the first application she made was for general radiology privileges, but she did not request, and it's in the record before the court, she did not request CT or ultrasound privileges. All those privileges are granted. Then subsequently, Your Honor, you know, she can go ahead, she is considered a staff member of Children's Hospital. She has received her privileges. She can practice radiology at that hospital. But she decides not to. Instead, she decides, I need more privileges. I need privileges in CT and ultrasound. And she subsequently makes a, again, in the record, there's supposedly an oral request in August for those privileges. Then she makes a written request in November. And once that written request is made, frankly, the ball starts rolling because there is a concern amongst those conducting the that she doesn't have sufficient clinical experience in ultrasound and CT. And that's what this whole delay and question is about. And if you, again, I would urge the court to look at the record. There's a lot of e-mails flying back and forth. There are different requests that are made from the hospital as far as, will you produce evidence? You know, we want a recommendation, for example, from UCSD. I'm sorry, Your Honor, you've got your hand up. At this timing, didn't she have privileges at another hospital on CT and scans? Your Honor, she had privileges at UCSD on CT and ultrasound. And then towards the end of the process that they were going through, she also informed Children's for the first time that she also had privileges for CT and ultrasound at Kaiser Permanente San Diego. So she did have privileges in those specific areas from two other hospitals. Now, eventually, after making several requests, Children's Hospital received the recommendation that it had requested from the chair of radiology of UCSD. And what it did, Your Honors, is it confirmed one of the concerns that they had. And what it says specifically is, over the last years, Dr. Hilton has not been involved in interpreting more than a handful of CT and ultrasound examinations. That shortage of clinical experience that the hospital was so concerned about, and that was driving this peer review. And again, going through the e-mails, going through the requests, you'll see clearly from the record that's before this court that it is peer review trying to get to the bottom of this issue. The hospital asks, what's your experience, your hands-on experience on CT and ultrasound? And they get back, I went to Cincinnati and observed. And here's my letter from Cincinnati. That's not answering our question. Our question is, what hands-on experience did you have? And that is one of the significant problems. You know, when she made the request in November, six months later, it's not resolved. Granted, that is not a particularly short period of time. But in peer review processes, that is not an extensive period of time, especially when there is back and forth, give and take. And the questions being asked by the hospital are not being answered. How much discovery was conducted in this case? There was no discovery, Your Honor. So this agreement, it's not a written agreement? It's alleged to be a written and oral agreement. I've never seen this agreement, Your Honor. It's not anywhere in the record? It's not anywhere in the record other than the allegations and the complaint. And that would be the first complaint, not the complaint that isn't part of the record. That's correct, Your Honor. Well, by that time, hadn't the case been dismissed? No, Your Honor, the initial complaint. When the second complaint came in? The second complaint, what happened, Your Honor, is there was a motion to dismiss that was brought by Children's Hospital and was joined in by all the physician defendants, which included all the individual named physicians, as well as their medical group, which was SDDR.  It was dismissed based on these being immune professional review activities with respect to all the parties, but the district court wasn't sure whether SDDR, the group, was one of the persons entitled to immunity under the statute, so it denied the motion with respect to SDDR. And then subsequently on behalf of SDDR, we brought a separate motion to dismiss, and then in opposition to that motion came a copy of this proposed amended complaint with a footnote request, rather than a motion for leave to amend. One area I want to touch on briefly, Your Honors, is with respect to an alternative. While we believe that HICWA immunity applies here, and because of the absolute privilege of professional review activities, the claims are barred and the district court acted properly. No, Your Honor, not going there. Where I am going, however, as an alternative ground, is that there is no antitrust injury here, and therefore the plaintiff's Sherman Act claims must fail for lack of antitrust. Well, this one should be relatively easy, Your Honor, and one of the main reasons for that is the Seventh Circuit in BCB anesthesia care did a very thorough review of the state of antitrust injury with respect to these types of hospital staffing issues. And after doing a survey nationwide of cases, and there are 28 of them cited in this opinion from all around the country, the court concluded flat out that a staffing decision does not itself constitute an antitrust injury. Whatever the staffing decision is. Right. And one of the staffing decisions that we're talking about, and in the survey that they did, was routinely denial of privileges. Right? And what the court went on to say is that the cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in WETS publications are devoted to the issues those circumstances present. Those hundreds or thousands of pages almost always come to the same conclusion. The staffing decision at a single hospital was not a violation of the Sherman Act. And that's exactly what we have here. So we've got all of these cases, and by the way, this circuit has said the same thing in Austin, that Austin was not even a denial of staffing, similar to our case here, and the court had no trouble finding there was no antitrust injury in that case. And another thing, another point that the Seventh Circuit made, let me grab my notebook here, is that it, from that court's perspective, didn't matter whether this was decided on a motion to dismiss or on a motion for summary judgment. And the court said, and I quote, we do not think it's significant, as the dissent suggests, that plaintiffs have usually lost at the summary judgment stage rather than by dismissal. What is significant is that they have lost as a matter of law because of an apparently uniform conclusion that without something more, a staffing pattern dispute at one hospital does not cause an unreasonable restraint of trade within the ambit of the antitrust law. What's the name of that case? That, Your Honor, is B.C.B. Associates. 36-5-3-664? Yes. That's correct, Your Honor. And again, that's consistent with Austin. And, in fact, looking at this, as you know, one of the major impetuses and policies behind HCWA is for, is the notion of promoting peer review and removing obstacles to physicians participating in peer review. And the courts, I think, have, including Austin, have indicated that the question of immunity should be decided as quickly as possible in the proceedings in order to minimize the negative aspects and the negative drag that this litigation has on those doctors participating in peer review. That's a judgment call that Congress has made. That's a judgment call that the courts, including the Ninth Circuit and Austin, have gone and signed up on. And here we have a situation where, particularly where you've got an alleged market division agreement or market share agreement that makes no sense compared to the history of what has occurred as far as Dr. Hilton being granted immediately the privileges, all the privileges she requested, and then subsequently being granted the additional privileges she requested. It seems to me that in furtherance of the policy of HCWA to minimize the burdens of litigation on thousands of physicians across the country who are participating in peer review, that this type of decision for immunity, and as, Judge, you indicated that there's no question that with respect to peer review activities, absolute immunity applies. Here is such a situation. We've got peer review activities. Absolute immunity applies. That decision should be made quickly in order to minimize the expense and further the public policies behind HCWA. Thank you, Counsel. Thank you, Your Honors. Thank you. I think this panel has focused on the issues that should be focused on, the 12B6 record being probably the first issue. Where's this written agreement? Pardon? Where's this written agreement? If we had a copy, we would have given it to you, Your Honor. Our first knowledge of it as set forth in the initial complaint came from Dr. Radke at UCSD who said there was agreement, an agreement we subsequently learned. So you're saying you don't have it because you haven't been able to do any discovery. We've got no discovery. We also learned in an exchange of letters between UCSD, Dr. Radke and Dr. Edwards, another professor of pediatric radiology at UCSD, which is not in the record in front of you, that UCSD. Don't tell me about it. Okay. That's fine. But it's out there. So what do you do with BCB anesthesia care limited cited in page 27 of the brief involving legions of cases that Sherman Act doesn't cover these kinds of situations? We're talking about antitrust injury. Right. Okay. Brunswick. Virtually all those cases, Your Honor, involve a single doctor who had privileges, whose privileges were terminated because of a marketing division agreement. No. Because of objectively discernible difficulties with their particular practice. And the courts have held quite properly that if, you know, you've got a single troubled doctor in a plural market with lots of hospitals, lots of doctors, that may be a concern for the doctor. Is it a concern for the market? No. None of those cases cited by the Seventh Circuit involved a children's hospital within a given geographic market that literally defined the market. None of those cases involved a specialty group, whether cardiology, radiology, or any other, where the private proprietary partnership controlled the gates to admission to that field of practice. And if you didn't practice at that hospital, you couldn't practice in that geographic market. Now, I can be a radiologist in San Diego and not practice at Children's. If I were simply a radiologist and Children's wouldn't let me in for whatever reason, I probably couldn't state antitrust injury because there's a plethora of other hospitals. If I'm a pediatric radiologist that doesn't do even garden variety pediatric radiology, but does the heavy stuff, there used to be two places in San Diego, University Hospital, operated by UCSD, that had a large pediatric facility, and Children's. UCSD shut down. Children's is the only act in town. If I'm a parent of a kid, I want that market, which is literally defined by Children's, to be as competitive as possible. Does this relate only to Dr. Hilton? No. The allegation anyway, and we believe the evidence will show, the restriction, the restraint, is on anybody that isn't a partner or profitable subordinate employee of SDDR. Other than that, the gate is closed. And the light is off, Counselor. Your time has expired. I can take that signal, Your Honor. It's a complicated case. We'll study it some more before we make a decision. It's order submitted. We'll be in recess until tomorrow morning. Thank you very much, Your Honor. I appreciate your time. Thank you. All rise.
judges: Trott, Callahan, Magill